UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MINDY ELIAS, as natural guardian of Aiden
Hanes Elias, a minor by and through his
parents, JAMES ELIAS, as natural guardian of
Aiden Hanes Elias, a minor by and through his
parents,

                  Plaintiffs,

v.                                               Case No.  5:04-cv-36-Oc-10GRJ

EVENFLO COMPANY, INC.,

                  Defendant.

_____

## REPORT AND RECOMMENDATION[1]

      Pending before the Court are Defendant's Motion for Summary Judgment (Doc.

46), and Defendant's Motion to Exclude Expert Testimony of Dr. Kenneth Brown. (Doc.

48.)[2] Plaintiffs have filed responses to the motion for summary judgment (Docs. 54, 59

& 62) and to the motion to exclude their expert's testimony (Doc. 78), and the matter is

now ripe for the Court's review.

      For the reasons discussed below, it is **RECOMMENDED** that Defendant's motion

for summary judgment (Doc. 46) be **GRANTED** in part and **DENIED** in part, and

Defendant's motion to exclude the testimony of Brown (Doc. 48) be **DENIED**.

---

    [1] Specific written objections may be filed in accordance with 28 U.S.C. §636, and Rule 6.02,
Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation. Failure to file
timely objections shall bar the party from a *de novo* determination by a district judge and from attacking
factual findings on appeal.

    [2] Defendant has also filed a motion to supplement evidence in support of its motion for summary
judgment and to strike the affidavit of Plantiff (Doc. 82),  which the Court will address in this Report and
Recommendation.

## I. **BACKGROUND & FACTS**

On December 26, 2002, Mindy Elias purchased an Evenflo toddler car seat for her then two-year old son, Aiden Elias, from a K-Mart store located in Madison, North Carolina.[3] There is conflicting evidence whether the seat was purchased in its original packaging or purchased "open box."[4] Mrs. Elias installed the car seat in the parking lot of K-Mart and left the box at the store.[5] The next day, with Aiden secured in the car seat, the pair drove from North Carolina to Ocala, Florida - a car trip that lasted approximately nine to ten hours.[6]

Mrs. Elias stopped about three or four hours into the trip in order to purchase fuel and to change Aiden's diaper.[7] While changing his diaper, Mrs. Elias did not notice any wetness or unusual marks on his clothing or skin.[8] She stopped the car at another point into the trip to purchase more fuel and to change Aiden's diaper again, but Mrs. Elias does not recall where they stopped or how many hours had passed between the first

---

[3] Affidavit of Mindy Elias, Doc. 60, Ex. C.

[4] During a July 30, 2004 deposition, Mrs. Elias provided sworn testimony that, at the time of purchase, the car seat was in a box sealed with tape, and it did not appear to be dented, dirty, or stained. *See* Deposition of Mindy Elias, Doc. 57, p. 20. Defendant has provided excerpts of transcripts taken from the depositions of Daniel J. Martin, M.D., and Elizabeth Beierle, M.D., who treated Aiden at Shand's Hospital after the incident. Both doctors testified that Mindy Elias told them she purchased the car seat "open box." *See* Deposition of Daniel Martin, Doc. 47, Ex. E, p. 26, and Deposition of Elizabeth Beierle, Doc. 47, Ex. F, p. 80. In her sworn affidavit dated April 19, 2005, Mindy Elias avers that she never told "any person at Shands" that she purchased the seat open box. *See* Affidavit of Mindy Elias, Doc. 60, Ex. C.

[5] Deposition of Mindy Elias, Doc. 57, p. 23.

[6] *Id.*, pp. 25-28.

[7] *Id.*, p 26.

[8] *Id.*, p. 27.

and second stop.[9] Prior to the second stop, Aiden had spilled juice on his pants, and, other than the juice, his mother did not notice any unusual substances or markings on Aiden's clothes or skin while she changed his diaper.[10] Midway between the second stop and their arrival at their friends' house in Orange Springs, Florida, Mrs. Elias noticed that Aiden became irritable and was crying.[11]

About one hour after their arrival, Aiden's mother noticed a red rash on the side "diaper line" of Aiden's left leg when she prepared him for a bath.[12] She did not notice anything on the clothes he was wearing prior to the bath.[13] Mrs. Elias bathed Aiden and then applied Desitin diaper rash cream to the irritated area.[14]

She put Aiden to bed at about 8:00 p.m., and he woke up crying three or four hours later with a fever of 102 degrees.[15] Mrs. Elias bathed Aiden once again to reduce his fever, and noticed that the irritated area now looked like a bruise.[16] His mother and a family friend, Joe Sesco, then took Aiden to the emergency room, arriving there at about 1:00 a.m.[17]

---

[9] *Id.*, p. 28.

[10] *Id.*, p. 29.

[11] *Id.*, pp. 30-31.

[12] *Id.*, p. 32.

[13] *Id.*

[14] *Id.*, p. 33.

[15] *Id.*, p. 34.

[16] *Id.*, pp. 34-35.

[17] *Id.*, p. 35.

Upon inquiry by medical personnel if anything had been changed in Aiden's daily living conditions, Mrs. Elias told them that she had just purchased a car seat for her son.[18] After Mrs. Elias brought the seat into the hospital at the direction of medical personnel, an inspection of the seat revealed a blue, gel-like substance on its bottom, where Aiden's left side would have been seated.[19] A pH test of the substance, conducted at the emergency room, revealed a pH level of nine.[20] Dr. Elizabeth Beierle, a physician who treated Aiden at the hospital, stated that a pH of nine reveals a substance which is alkaline in nature, and alkali substances are known to cause skin burns.[21] Ultimately, Aiden was diagnosed with second and third degree chemical burns to his thigh and buttocks.

Plaintiffs assert that Aiden's burns resulted from his contact with the blue substance found on the child seat. The amended complaint[22] is framed in five separate counts. Counts I and II present claims for strict liability, Count III advances a claim for negligence, Count IV advances a claim for breach of warranty, Count V advances a claim for misrepresentation, and Count VI presents a claim for common law fraud.

## II. STANDARD OF REVIEW

Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

[18] *Id.*, p. 32.

[19] *Id.*, pp. 38-39; Affidavit of Mindy Elias, Doc. 60, Ex. C.

[20] Deposition of Mindy Elias, Doc. 57,  p. 38.

[21] Deposition of Elizabeth Beierle, Doc. 61.

[22] Doc. 12

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[23] Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party."[24] The moving party bears the burden of proving that no genuine issue of material fact exists.[25] If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case.[26]

In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party.[27] The court may not weigh conflicting evidence or weigh the credibility of the parties.[28] If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then a court must not grant summary judgment.[29]

---

[23] Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[24] *Id.*

[25] Celotex v. Catrett, 477 U.S. 317, 323 (1986).

[26] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 474 U.S. 574, 586 (1986).

[27] Anderson, 477 U.S. at 255.

[28] *See* Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 919 (11th Cir.1993)(*citation omitted*).

[29] *Id.* (*citation omitted*).

## III. <u>DISCUSSION</u>

### *A. Strict Liability*

Defendant contends that Plaintiffs' strict liability and negligence claims fail as a matter of law because Plaintiffs cannot establish that the blue substance was on the child seat when it left Evenflo's Piqua, Ohio manufacturing plant. Defendant states that Plaintiffs' only evidence relating to "the probable origin of the blue substance" comes from Dr. Brown, but his testimony is "unsupported, unreliable, and ultimately incompetent."[30]

To present a strict liability action under Florida law, a plaintiff must establish that: (1) a defect was present in the product; (2) it caused the injuries complained of; and (3) it existed at the time the manufacturer parted possession with the product."[31]  The first prong of the tripartite test may be satisfied through the application of Florida's *"Cassisi* inference," which "simply states that when a product malfunctions during normal operation, a legal inference [of defect] ... arises, and the injured plaintiff thereby establishes a prima facie case for jury consideration."[32]

Thus, to obtain the benefit of a legal inference of defect, a plaintiff may provide circumstantial evidence that a malfunction occurred during normal use.[33] This inference then establishes a *prima facie* case of defect for a jury's consideration. Furthermore,

---

[30] Defendant makes the same general arguments in its motion to strike Brown's testimony. *See* Doc. 48.

[31] *See* <u>Cassisi v. Maytag Co.</u>, 396 So. 2d 1140, 1143 (Fla. DCA 1981).

[32] <u>Kaplan v. Daimlerchrysler, A.G.</u>, 2003 WL 22023315 at *2 (11th Cir. 2003).

[33] *Id.*

under Florida law, once a plaintiff establishes a product's malfunction during normal use, a plaintiff is not required to negate alternate grounds of causation.[34] "To prevent the issue from going to a jury, a defendant manufacturer effectively 'must offer evidence showing there are no genuine issues of material fact to be resolved by a jury-rather than suggest alternative explanations of the malfunction.'"[35]

The normal use requirement set forth in *Cassisi* is based on the "consumer expectations test," which asks whether the ordinary consumer's expectations are frustrated by the product's failure to perform under the circumstances in which it failed.[36] Although in some situations the normal use inquiry can be determined as a matter of law, the Eleventh Circuit has stated that it is generally a question of fact for the jury.[37]

### *Existence of a Defect*

Here, it is readily ascertainable that Plaintiffs, at the very least, have provided genuine issues of material fact with respect to the first prong of the tripartite test. That is, they have shown, via circumstantial and direct evidence[38] that their consumer expectations were frustrated by the car seat's failure to perform appropriately under the circumstances in which it was used.

---

[34] *Id. Citing* Cassisi at 1149-1150.

[35] *Id. Quoting* Zyferman v. Taylor, 444 So. 2d 1088, 1092 (Fla. DCA.1984).

[36] *See* Edic ex rel. Edic v. Century Products Co., 364 F. 3d 1276, 1285 (11th Cir. 2004).

[37] *Id.* at FN 7.

[38] The *Cassisi* Court stated that a plaintiff may establish a case through either direct or circumstantial evidence of a defect, "the latter frequently accomplished through the opinion testimony of an expert." Cassisi at pp. 1146-1147.

As mentioned earlier, Plaintiffs purchased the car seat on December 26, 2002. Aiden's injuries occurred the following day. Defendant admitted that it manufactured the subject car seat approximately seven (7) months earlier, on May 22, 2002, at its Piqua, Ohio facility.[39] On the day of its manufacture, one of five hundred and twenty two seats assembled did not pass inspection.[40] Defendant stated that, as of May 22, 2002, it did not have a tracking system which would have enabled it to track when a particular car seat left the manufacturing plant.[41] Defendant also stated that it did not know when or if the non-conforming seat manufactured on May 22 left the Piqua facility.[42] Finally, the director of assembly operations at the subject facility testified that every car seat that leaves the facility does so in a carton closed and sealed with an automatic tape machine.[43]

Plaintiff has provided sworn testimony that she purchased the car seat in a carton sealed with tape, like it would come from a factory.[44] She has denied telling anyone at the hospital that she purchased the car seat in an open box.[45] Indeed, a family friend who accompanied Mindy and Aiden Elias during the entire time they were in the emergency room also provided sworn testimony that he never heard Mindy Elias

---

[39] Defendant's responses to requests for admission numbers 2 & 3, Doc. 60, Ex. J.

[40] Deposition excerpt of Evenflo quality manager Robert L. Fitzharris, Doc. 79, Ex. A, p. 83.

[41] Defendant's response to request for admission number 9, Doc. 60, Ex. J.

[42] *Id.*, request for admission number 10.

[43] Declaration of Walter Minch, Doc. 47, Ex. B.

[44] *See* Deposition of Mindy Elias, Doc. 57, p. 20.

[45] Affidavit of Mindy Elias, Doc. 60, Ex. C.

tell anyone that she purchased the seat in an open box.[46] Viewing the facts in a light most favorable to the Plaintiffs, a reasonable mind could infer that the box remained sealed from the time it left the Piqua manufacturing plant up until Mindy Elias opened it at K-Mart.

It is undisputed that there was a blue substance on the seat at the time it was inspected at the hospital. Joseph Sesco and Mindy Elias specifically have testified that it was only discovered under the car seat pad after it was lifted up.[47] It is also undisputed that the blue substance was partly comprised of benzyl chloride - a chemical which is corrosive and harmful to the skin.

Given the foregoing, the Court concludes that the *Cassisi* inference arises in this case to satisfy the first prong of the strict liability tripartite test: the presence of a defect in the child seat. The inquiry, of course, does not end here. The Court must next

---

[46] Affidavit of Joseph Sesco, Doc. 60, Ex. B.

In its motion to supplement evidence in support of its motion for summary judgment and its motion to strike Mindy Elias' affidavit (Doc. 82), Defendant calls into question the credibility of Mindy Elias' testimony regarding her denial of telling any hospital personnel that the seat was purchased open box. In support of its motion, Defendant provides the deposition testimony of Joseph Sesco wherein he answered in the affirmative to the following question: "Did [Mindy] tell you she did not remember whether the box was opened or closed when she purchased it? Is that true?" Answer: "I believe that's true. Yes." Sesco's deposition, p. 79, Doc. 82, Ex. A.

In response to Defendant's motion to strike the affidavit of Mindy Elias, Plaintiffs assert that Defendant filed the motion and Sesco's deposition transcript in support thereof prior to Sesco's review and completion of an errata sheet. Since the deposition, Sesco has done so and changed his answer to the above question as "no." *See* Doc. 83, Ex. A.

Because issues going to the weight and credibility of evidence are left to the finder of fact, *see* Tippens v. Celotex Corp., 805 F. 2d 949, 954 (11th Cir. 1986), the deposition testimony of Joseph Sesco does not change the Court's view that there is an issue of fact to be resolved at trial. Therefore, because the Court has considered the deposition of Joseph Sesco and considered the affidavit of Mindy Elias in its review of Defendant's motion for summary judgment Defendant's motion to supplement evidence is due to be **GRANTED** but that portion of its motion requesting the Court to strike the affidavit of Mindy Elias is due to be **DENIED**. (Doc. 82.)

[47] Affidavit of Mindy Elias, Doc. 60, Ex. C; Affidavit of Joseph Sesco, Doc. 60, Ex. B.

consider whether Plaintiffs have established the remaining two prongs: causation and existence of the defect when Defendant parted possession with the product.[48]

### *Causation*

Defendant argues that Plaintiffs have failed to carry their burden of proof regarding causation because they have not provided direct evidence that the blue substance actually caused Aiden's injuries. Defendant's argument on this issue is due to be rejected, as Plaintiffs are not saddled with such a burden in a strict liability case such as this. Rather, Plaintiffs in this instance are put to the task of proving, by a preponderance of the evidence, that the blue substance was a substantial factor in bringing about Aiden's injuries.[49]

Here, Plaintiffs have produced numerous sources of evidence to prove that the substance on the child seat was a substantial factor in bringing about Aiden's injuries. First, both parties' experts have opined that the substance found on the car seat is corrosive and harmful to the skin.[50] Dr. Kenneth Brown, Plaintiffs' chemical expert, also opined that, "to a reasonable degree of scientific certainty [...] the cause of the injury to

---

[48] Defendant confuses the application of the *Cassisi* inference. Defendant contends that the inference should not apply because Plaintiffs have not shown a defect existed when Defendant parted possession with the seat. As mentioned earlier, the Eleventh Circuit has interpreted *Cassisi* as relevant only to the first prong of the three-part strict liability test; *i.e.* whether a product contained a defect. *See* Kaplan v. Daimlerchrysler, A.G., 2003 WL 22023315 at *2 (11th Cir. 2003). *Cassisi* does not preclude summary judgment in favor of a manufacturer where a plaintiff fails to show causation or the existence of a defect at the time the manufacturer parted possession with the product at issue.

[49] *See* Christopher v. Cutter Laboratories, 53 F. 3d 1184, 1191 (11th Cir. 1995)("[...] plaintiffs must show that it is more likely than not that the defendant's acts was a substantial factor in bringing about the injury.") *Citing* Reaves v. Armstrong World Industries, Inc., 569 So. 2d 1307, 1309 (Fla. DCA 1990)(Causation must be more than merely "conceivable."). *Accord* Pulte Home Corp., Inc. v. Ply Gem Industries, Inc., 804 F. Supp 1471, 1486 (M.D. Fla. 1992).

[50] McCarty's expert report, Doc. 76, Ex. G, p. 3; McCarty's Deposition, Doc. 72, pp. 47-48.

Aiden Elias was the blue gel-like substance found on the car seat."[51] Dr. Beierle opined

that, within a reasonable degree of medical probability, Aiden suffered from a chemical

contact burn.[52]She also testified that although she could not say with one-hundred

percent certainty that the blue substance caused the burn, "there is a significant

likelihood that is was a significant contribution to his injury."[53] It follows that Plaintiffs

have carried their burden with respect to causation.

### *Control*

Turning now to the third and final prong of the strict liability test, Defendant points

to Plaintiffs' failure to establish the existence of the alleged defect when it parted

possession with the car seat. Defendant argues that "the only evidence relating to the

probable origin of the blue substance comes [...] from Dr. Kenneth Brown," whose

testimony and opinions on this issue should be stricken from the record because they

are unreliable and incompetent.

The blue substance found on the child seat was tested by Phoenix Chemical

Laboratory, Inc., at the direction of Plaintiff's chemical expert, Dr. Kenneth Brown. The

lab performed a Fourier Transform Infrared Test ("infrared spectroscopy") of the

substance,[54] and found that it contained sodium salt of EDTA, a small amount of mineral

oil, and alkyldimethylbenzylammonium chloride ("benzyl chloride") - a substance known

---

[51] Brown's expert report, Doc. 64-3, at p. 2.

[52] Beierle's Deposition, Doc. 61, p. 109.

[53] *Id.* at p. 111.

[54] *See* Doc. 64-4, Phoenix Chemical Laboratory, Inc. test results. (The test produces a series of graphs showing peaks and valleys representing the existence of chemical components present in a substance.) *See* Deposition of Kenneth Brown, Doc. 64, p. 97.

to be highly corrosive.[55] Brown noted that the lab results suggested the substance could be a cleaning material and disinfectant.[56]

After the completion of his preliminary report, Brown reviewed a list of chemical products used at Evenflo's Piqua, Ohio plant, where the car seat at issue was manufactured.[57] He then researched the Material Safety Data Sheets ("MSD sheets") of two chemical products listed, "Cide-Bet Fresh and Clean" and "Disinfectant Cleaner for Porcelain/Toilet Bowls/Urinals (Bol Maid),"[58] and found that they both contained alkyldimethylbenzylammonium chloride, also known as "Quats" or "benzalkonium chloride."[59] Based on his research, Brown concluded that either one or both of the products, alone or in combination, may have at least partially composed the blue, gel-like substance found on the car seat.[60] Admittedly, Brown did not conduct chemical analyses of the two products to determine conclusively that either of them or a mixture of the two were chemically identical to the substance found on the car seat.[61]

---

[55] Deposition of Kenneth Brown, Doc. 64, p. 102. *See Also* Brown's expert report, Doc. 64-3.

[56] Brown's expert report, Doc. 64-3.

[57] Deposition of Kenneth Brown, Doc. 64, pp. 11-12.

[58] *Id.* at pp. 13, 15 & 16.

[59] *Id.*, p. 12.

[60] *Id.*, p. 17.

[61] *Id.*, pp. 17-18.

McCarty, a product integrity engineer formerly employed by Defendant,[62] also performed testing of the blue substance on behalf of Defendant.[63] First, he performed a pH test which showed that the pH was between eight and nine.[64] Next, McCarty sent a sample of the substance to NAMSA, an outside chemical laboratory, for further analysis.[65] The NAMSA Gas Chromatography/ Mass Spectroscopy test ("GCMS test") identified volatile compounds in the blue substance, one of which was benzyl chloride.[66] McCarty compared the chemical components of the blue substance as measured by NAMSA's GCMS test to the MSD sheets for all products used at the Piqua manufacturing plant and found no MSD sheet that listed benzyl chloride as an ingredient.[67] Based on this data, McCarty concluded that the blue substance did not come from known chemicals used at Evenflo's Piqua manufacturing plant.[68] Later, however, Defendant admitted that "Evenflo [...] confirmed that the two cleaning products were in fact purchased for the Piqua facility."[69]

During the course of his deposition on January 28, 2005, McCarty agreed with Dr. Brown's chemical analysis of the substance to the extent that it contained sodium

---

[62] McCarty left Evenflo's employ in November 2002. *See* McCarty Deposition, Doc. 72, p. 23.

[63] McCarty's expert report, Doc. 76, Ex. G, p. 3.

[64] *Id.*

[65] *Id.*

[66] *See* NAMSA Gas Chromatography/ Mass Spectroscopy report, Doc. 64-14.

[67]  McCarty's expert report, Doc. 76, Ex. G, p. 4.

[68] *Id.*

[69] *See* Defendant's Motion to Extend Deadline to Designate Experts, Doc. 33, at ¶ 19.

salt of EDTA and benzyl chloride.[70] He also agreed that the chemical components of the substance revealed in Brown's report "matched up" with the MSD sheet for Cide-Bet.[71] However, in light of the NAMSA study, McCarty testified that he could "rule out" Cide-Bet as the blue substance. Finally, he stated that there was "no chance" that the blue substance found in the car seat was the "Disinfectant Cleaner for Porcelain/Toilet Bowls/Urinals," because the pH in the cleaner (1 or 2) was too low.[72]

A third expert, Dr. Connie Hendrickson, performed an infrared spectroscopy analysis of the two cleaning products at issue on behalf of Defendant.[73] Dr. Hendrickson ruled out Cide-Bet as the blue substance because, although it contained EDTA and benzyl chloride (as did the blue substance), Cide-Bet was not blue in color.[74] She also ruled out Bol-Maid as the blue substance because, unlike the blue substance, it contained no EDTA.[75]

According to Defendant, the opinion offered by Hendrickson defeats Plaintiff's mission to prove that the blue substance could have been on the car seat when it was under Evenflo's control. However, viewing the facts in a light most favorable to Plaintiffs,

---

[70] *See* Deposition of Matthew McCarty, Doc. 72, p. 46.

[71] *Id.* at p. 50.

[72] *Id.* at pp. 80-81.

[73] *See* Hendrickson's Affidavit, Doc. 47, Ex. G., at p. 2. The Court notes that this was the same testing methodology Dr. Brown performed on the blue substance. *See* Hendickson's report, Doc. 47, Ex. G, p 1.

[74] *See* Hendickson's report at p. 2., Doc. 47, Ex. G.

[75] *Id.* Hendrickson provided in her report that infrared spectroscopy is a technique commonly used with surfactants for qualitative analysis of cleaning materials. Defendant has urged the Court to strike the testimony of Dr. Brown based on several of the *Daubert* factors. For the reasons stated in Plaintiffs' opposition to their motion, which are fully incorporated into this recommendation, Defendant's motion to exclude the testimony of Dr. Brown (Doc. 48) is due to be **DENIED**.

and recognizing that they are not put to the task of providing direct proof of a product's defect prior to its departure from the manufacturer,[76] the Court disagrees.

To avoid a jury's consideration of Plaintiffs' case, Defendant must offer evidence showing there are no genuine issues of material fact to be resolved rather than merely suggest possible alternative reasons for a product's defective condition.[77] Here, Hendrickson's opinion fails to demonstrate that there are no genuine issues of material fact regarding the origin of the blue substance. Rather, a close inspection of her report produces even more issues which should be considered by a jury.

As detailed above, Hendrickson performed the same test on Cide Bet and Bol Maid as Brown performed on the blue substance: infrared spectroscopy. Brown discovered that the blue substance contained EDTA, a small amount of mineral oil, and benzyl chloride. Hendrickson's study showed that Cide Bet contained EDTA and benzyl chloride, but, upon direct observation, it was not blue in color. Hendrickson's study of Bol Maid showed the existence of benzyl chloride, but no EDTA. Finally, Hendrickson compared the spectroscopy scans of Cide Bet and Bol Maid to a literature scan of ethoxylated nonylphenol (EN), a common cleaning surfactant, and found that the scans of the two cleaning products indicated the presence of EN while the scans of the blue substance did not.[78]

---

[76] "[The Cassisi inference] is founded upon strong policy considerations that aid a plaintiff in meeting his burden of proof when direct proof of product defectiveness is wanting." Cassisi at 1149. *See Also* Cassisi at 1150 (The Plaintiff is not required to rule out every possible source of the defect.)

[77] Cassisi at 1151.

[78] Hendrickson's expert report, Doc. 47, Ex. G, p. 2.

At first blush, the results of Hendrickson's test appear to be compelling. However, in view of Mathew McCarty's deposition testimony, such results *fail* to rule out either cleaning product as the source of the blue substance. First, McCarty explained that GCMS and infrared spectroscopy are two different types of tests.[79] The former separates, identifies and measures the amount of each compound in a substance.[80] The latter "only looks at the substance as a whole, and then gives a spectrum of the strongest characteristic of the substance."[81]

Such testimony does more than simply refute McCarty's purported ability to "rule out" either of the cleaning products as the source of the blue gel (as he compared the GCMS test of the blue substance to the infrared spectroscopy of the two cleaning agents) - it also calls into question the accuracy of Hendrickson's infrared spectroscopy analysis. As the methodology only provides a fingerprint of a substance's *strongest* characteristic, the test results of Hendrickson's spectroscopy scan of the Bol Maid would not reveal whether or not there was a limited presence of EDTA in the product. Likewise, it is also possible that EN was not captured by Brown's spectroscopy scan of the blue gel-like substance due to the limited presence of EN in the blue substance.

Furthermore, Hendrickson ruled out Cide Bet as the blue substance because the Cide Bet is clear and colorless. Notably, McCarty testified that the seat pad of the child

---

[79] McCarty's deposition, Doc. 72, pp. 51-52.

[80] *Id.*, p. 53.

[81] *Id.*

seat was discolored where the foreign substance had made contact with it.[82] He stated that there was "some white kind of spot on top of [the seat pad]."[83] This is suggestive that the substance, once applied to the seat pad, simply bleached and absorbed the seat pad's color.

Moreover, even if scientifically accurate test results did rule out the cleaning products as a source of the blue substance, (which the Court concludes they have not) that "fact" alone would not satisfy Defendant's burden to show that there are no genuine issues of material fact with respect to how the foreign substance may have made contact with the seat while it was under Defendant's control. As the *Cassisi* Court instructed, the inference applied to cases such as this one "is somewhat analogous to the *res ipsa loquitur* inference [...]. Both legal inferences are similar since they are based upon common sense assumptions that the occurrence of the accident is such that in the ordinary course of events it could not have happened [...] without the product's defective condition."[84]

In view of the foregoing, the Court concludes that there are sufficient issues of fact with regard to Plaintiffs' claim sounding in strict liability and, therefore, summary judgment on the strict liability claims is due to be denied.

---

[82] *Id.* at 42.

[83] *Id.*

[84] Cassisi at 1149. *Citing* Prosser: "strictly speaking, since proof of negligence is not an issue, res ipsa loquitur has no application to strict liability; ... the inferences which are the core of the doctrine remain, and are no less applicable." Prosser, Law of Torts, s 103 at 672-73 (4th ed. 1971).

**B. Negligence**

A cause of action for negligence consists of the following three elements which must be pled and proven: (1) the existence of a duty recognized by law requiring the defendant to conform to a certain standard of conduct for the protection of others; (2) a failure on the part of the defendant to perform that duty; and (3) an injury or damage to the plaintiff proximately caused by such failure.[85] The law imposes upon manufacturers a duty to exercise reasonable care so that their products in the marketplace will not harm persons or property.[86]

Defendant argues that Plaintiffs cannot establish that it owed them a particular duty because "the duty of care arises only where the manufacturer can be charged with actual or implied knowledge of the alleged defect."[87] In support of this proposition, Defendant cites the Florida Supreme Court's 1961 decision in *Carter v. Hector Supply Co.*[88] There, an injured employee of the Dade County School Board brought a breach of implied warranty action against a retailer of a riding lawn mower seat which allegedly contained a latent defect. Comparing and contrasting negligence and breach of implied warranty claims, the Florida Supreme Court stated that a retailer could be held liable to a third party in a negligence action only if the retailer could be charged with actual or

---

[85] Strasser v. Yalamanchi, 783 So. 2d 1087, 1094 (Fla. DCA 2001).

[86] Cintron v. Osmose Wood Preserving, Inc., 681 So. 2d 859, 861-862 (Fla. DCA 1996). *Citing* Monsanto Agricultural Products Co. v. Edenfield, 426 So. 2d 574 (Fla. DCA 1982).

[87] Defendant's memorandum, Doc. 47, p. 13.

[88] 128 So. 2d 390 (Fla. 1961).

implied knowledge of the defect.[89] Likewise, the requirement of actual or implied knowledge of a defect has been extended to manufacturers.[90]

Under Florida law, evidence of the occurrence or non-occurrence of prior accidents is admissible where such pertains to the same type of appliance or equipment under substantially similar circumstances.[91] It is also properly considered the purpose of showing defendant's knowledge.[92]

Here, Defendant has provided evidence that it exercised reasonable care to insure that its products in the marketplace would not harm persons or property. Before products are manufactured, they are tested for quality.[93] Evenflo's manufacturing process of the child seat begins with repeated testing of it for compliance with federal motor vehicle safety standards and Evenflo's own quality standards.[94] During manufacture, products are inspected, and those that do not pass inspection are removed and "quarantined" from assembly.[95] Further, every car seat that leaves the

---

[89] *Id.* at p. 392.

[90]  See <u>Jackson v. H.L. Bouton Co., Inc.</u>, 630 So. 2d 1173, 1176 (Fla. DCA 1994).

[91] *Id. Citing* <u>Railway Express Agency, Inc. v. Fulmer</u>, 227 So. 2d 870, 873 (Fla. 1969); <u>Lasar Manufacturing Co., Inc. v. Bachanov</u>, 436 So. 2d 236 (Fla. DCA 1983); <u>Warn Industries v. Geist</u>, 343 So. 2d 44 (Fla. DCA 1977), *cert. denied*, 353 So.2d 680 (Fla.1977).

[92] *Id.*

[93]

[94] Deposition of Charles Roos, Doc. 47, Ex. D, p. 75.

[95]  Deposition excerpt of Evenflo quality manager Robert L. Fitzharris, Doc. 79, Ex. A, p. 83.

facility does so in a carton closed and sealed with an automatic tape machine.[96] Finally, Evenflo has no history of any incident similar to that of which Plaintiffs complain.[97]

In view of the foregoing evidence - to which Plaintiffs have offered nothing more than an argument in their attempt to create a genuine issue of fact - Defendant is entitled to summary judgment on Plaintiffs' negligence claim.

**C. Breach of Express Warranty**

In a claim for breach of an express warranty, the test of defectiveness is whether the product performs in accordance with the express warranty given.[98] Defendant has admitted that the box in which the car seat in question was packaged contained the following statements: (1) "Meets or exceeds all applicable U.S. or Canadian safety regulations;" and (2) This child restraint conforms to all applicable federal motor vehicle standards."[99]

As Plaintiffs point out, Defendant has not established that, viewing all the evidence in a light most favorable to Plaintiffs, Defendant would not have violated the very standards that it calls into question. In fact, Charles Roos, Director of Technical Services for Defendant, testified during his deposition that if the child seat left the Piqua facility with the blue substance on it, the manufacture and distribution of the seat would

---

[96] Declaration of Walter Minch, Doc. 47, Ex. B.

[97] Deposition of Charles Roos, Doc. 47, Ex. D, p. 41.

[98] Pulte Home Corp., Inc. v. Ply Gem Industries, Inc., 804 F. Supp. 1471, 1486-1487 (M.D. Fla. 1992).

[99] Declaration of Charles Roos, Doc. 47, Ex. H.

"probably be in violation of the Consumer Protection Act."[100] Taking such an assertion as true, Plaintiffs have provided an issue of fact sufficient to overcome Defendant's motion for summary judgment on their breach of express warranty claim.

### D. Fraud & Misrepresentation

The essential elements of a fraud claim are: (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the interpretation.[101] Fraud also includes the intentional omission of a material fact.[102]

Similarly, in order to allege a cause of action for negligent misrepresentation, a plaintiff must allege that: (1) the defendant made a misrepresentation of material fact believed to be true but which was in fact false; (2) the defendant was negligent in making the statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely and on the misrepresentation; and (4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresentation.[103]

Consistent with the Court's reasoning under the negligence claim, Defendant is entitled to summary judgment on the fraud claim because Plaintiff has failed to raise a

---

[100] Deposition of Charles Roos, Doc. 47, Ex. D, p. 75.

[101] Ward v. Atlantic Sec. Bank, 777 So. 2d 1144, 1146 (Fla. DCA 2001).

[102] Id. Citing Nessim v. DeLoache, 384 So. 2d 1341, 1344 (Fla. DCA 1980).

[103] Simon v. Celebration Co., 883 So. 2d 826, 832 (Fla. DCA 2004). Citing Fla. Std. Jury Instr. (Civ.) MI 8.

genuine issue of material fact regarding Defendant's knowledge that its representations about the safety of the child seat were false.[104] Likewise, Defendant is entitled to summary judgment on the misrepresentation claim because Plaintiff has failed to raise a genuine issue of material fact regarding its negligence in making the statement because Defendant should have known the representation was false.

### E. Breach of Implied Warranty

Plaintiffs have conceded that Defendant is entitled to summary judgment on their claim for breach of implied warranty. Accordingly, summary judgment with regard to this claim is due to be granted.

## IV.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that:

(1) Defendant's motion for summary judgment (Doc. 46) be **GRANTED** in part and **DENIED** in part. Defendant is entitled to summary judgment on Plaintiffs' claims for negligence, fraud, misrepresentation and breach of implied warranty, but is not entitled to summary judgment on Plaintiffs' claims for strict liability or breach of express warranty;

(2) Defendant's motion to exclude the testimony of Brown (Doc. 48) be **DENIED**.

(3) Defendant's motion to supplement evidence in support of its motion for summary judgment and motion to strike Mindy Elias' affidavit (Doc. 82) be **GRANTED**

---

[104] The result doesn't change even if the Court adopted the reckless or careless standard as to Defendant's purported knowledge that its representations were false. As Defendant employs sufficient quality assurance standards in its production of its products, it may rely on those standards and on its safety and inspection measures to make an assertion of the product's safety without exhibiting a reckless disregard for the truth.

with regard to supplementing the record with the deposition of Joseph Sesco and

**DENIED** with regard to Defendant's request to strike the affidavit of Mindy Elias.

IN CHAMBERS in Ocala, Florida, on this 8th day of July, 2005.

GARY R. JONES
United States Magistrate Judge

Copies to:
    The Honorable Wm. Terrell Hodges
    Senior United States District Judge

    Counsel of Record